**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------

NMS SPECIAL OPPORTUNITY FUND, LP,

Plaintiff,

-against-

GLOBAL STRUCTURED PRODUCTS (JERSEY) LIMITED; NFG SA; KEITH BEEKMEYER; NEWPOINT REINSURANCE COMPANY LIMITED; SPECIALTY RISK PARTNERS (USA) INC.; SPECIALTY RISK REINSURANCE INC.; JONATHAN MARK GORDON CLUBB; MARK PAYN; and FRANKIE MAJOR,

Defendants.

-------------------------------------------------------

Case No.:

**COMPLAINT**

Plaintiff NMS Special Opportunity Fund, LP ("NMS" or "Plaintiff"), by and through its undersigned attorneys, FROST LLP, for its Complaint against Defendants Global Structured Products (Jersey) Limited ("GSP"), NFG SA ("NFG"), Keith Beekmeyer, Newpoint Reinsurance Company Limited ("NPRE"), Specialty Risk Partners (USA) Inc. ("SRP"), Specialty Risk Reinsurance Inc. ("SRR"), Jonathan Mark Gordon Clubb, Mark Payn, and Frankie Major (collectively "Defendants"), alleges upon knowledge as to its own acts and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This is an action to enforce Plaintiff NMS's contractual right to redemption of its Series A Preferred Stock in Defendant GSP, at a redemption price equal to the original purchase price, plus all accrued and unpaid dividends, following GSP's continuing, uncured Events of

Default under the Amended and Restated Preferred Stock Purchase Agreement, including GSP's and NFG's failure to honor NMS's January 27, 2026 election of the Default Share Purchase, and GSP's failure to pay the redemption price demanded in NMS's written Notice of Default Redemption, served on September 3, 2026.

2. Under the Preferred Stock Purchase Agreement dated March 1, 2024 (the "PSPA," attached as Ex. A) and the Amended and Restated Preferred Stock Purchase Agreement dated February 11, 2025 (the "Amended PSPA," attached as Ex. B), GSP issued and sold to NMS 27,000 shares of Series A Preferred Stock, with an aggregate Stated Value of $2.7 billion, in exchange for Senior Secured Notes delivered by NMS, GSP then used and delivered those NMS Senior Secured Notes as consideration to acquire Medium Term Notes ("MTN Notes"), which GSP then deployed in transactions with affiliated and third-party counterparties to generate income, subject to NMS's investment committee consent and to GSP's obligation to adhere to the terms of the PSPA and Amended PSPA and pay dividends on the Series A Preferred Stock at specified rates.

3. Section 7.1(d) of the Amended PSPA entitles NMS, upon an uncured Event of Default, to force redemption at a price equal to the original purchase price, plus all accrued and unpaid dividends. GSP's uncured defaults—including its failure to pay dividends earned on GSP's deployment of the MTN Notes and its failure to obtain NMS's required investment committee consent for certain of those deployments—triggered, and continue to trigger, NMS's right to force the Default Redemption. GSP has failed and refused to pay the redemption price demanded, including more than $61,446,889.88 in accrued and unpaid dividends as of August 31, 2026, but which may only be calculated with access to and an accounting of GSP's and NFG's financial books and records.

4. These unpaid dividends stem from GSP's deployment of hundreds of millions of

dollars in MTN Notes to affiliated and third-part counterparties—including NPRE both as a direct equity investment and then as capital contributions on NPRE's behalf in connection with its obligations under its reinsurance contracts, Tradex Insurance Company PLC ("Tradex"), Soteria Insurance Limited ("Soteria"), SRP, and its subsidiary SRR—on the strength of NMS's investment committee's approvals, which were conditioned on GSP receiving fees, income participation, and equity interests that would in turn be paid to NMS as dividends. To date, GSP has failed to collect those contractually agreed amounts and has failed to document the terms of these transactions despite repeated assurances and requests. As to NPRE and SRP/SRR specifically, GSP knew it was contractually obligated to pay NMS out of the income it would receive from those transactions. Despite that knowledge, GSP accepted the return of the MTN Notes from these counterparties—without any notice to NMS and without accounting for the money and shares owed.

5. NMS alleges this nonpayment was not an oversight of GSP and certain board members, but the product of a collaborative scheme orchestrated by Defendant Keith Beekmeyer—Chief Executive Officer of Defendant NFG, GSP's common shareholder—to first install directors loyal to NFG on GSP's board, subordinate GSP's and NMS's contractual and equity interests to NFG's own, and, when NMS would no longer accept Beekmeyer's attempts to delay and avoid the payment obligations of NFG and its subsidiary, NPRE due to GSP and demand was formerly made by NMS, Beekmeyer then instructed his agent, Major, to initiate and fabricate a plan to make false and misleading statements to other GSP board members and the corporate secretary with the goal of creating pretextual regulatory excuse for nonpayment.

6. NMS brings this action directly, in its individual capacity, against GSP and NFG for breach of contract, breach of the implied covenant of good faith and fair dealing, and fraudulent inducement; against Beekmeyer, Clubb, Payn, and Major for fraud; against NFG and Beekmeyer

for tortious interference with contract; against NFG for aiding and abetting fraud; against GSP, NFG, Clubb, Payn, and Major for an accounting of all amounts received, retained, or disbursed in connection with the transactions described herein; against GSP, NFG, NPRE, SRP, and SRR for unjust enrichment; against GSP and NFG for conversion; and against GSP, NFG, Beekmeyer, Clubb, Payn, and Major for civil conspiracy.

## PARTIES

7. Plaintiff NMS Special Opportunity Fund, LP ("NMS") is a limited partnership organized and existing under the laws of the State of Delaware. NMS's general partner is NMS Capital Management GP, LLC, a Delaware limited liability company. NMS Capital Management GP, LLC's sole member is Trevor M. Saliba, a citizen of the State of California. NMS's Series A limited partner is Bteghrine Trust Holdings, LLC, a Delaware limited liability company, whose members are Trevor M. Saliba, a citizen of the State of California, and two minor citizens of the State of California. NMS's Series B limited partners are Christopher Botosan, a citizen of the State of Arizona, and GVT Global Trust, a trust organized under the laws of the State of Florida, whose trustee is a citizen of the State of Arizona. Accordingly, no general or limited partner of NMS is a citizen of Jersey, Channel Islands, Switzerland, the United Kingdom, the Federation of Saint Kitts and Nevis, Nevada, and Tennessee and NMS's citizenship is completely diverse from that of every Defendant named herein.

8. Defendant Global Structured Products (Jersey) Limited ("GSP") is a company organized under the laws of Jersey, Channel Islands, with its principal place of business in Jersey.

9. Defendant NFG SA ("NFG") is a company organized under the laws of Switzerland with its principal place of business in Geneva, Switzerland. It is the sponsor parent company to and common shareholder of GSP with its executive management and operations based in London,

United Kingdom.

10. Defendant Keith Beekmeyer is a citizen and resident of the United Kingdom and serves as Chief Executive Officer of NFG.

11. Defendant Newpoint Reinsurance Company Limited ("NPRE") is an international business corporation incorporated under the laws of Nevis, within the Federation of Saint Kitts and Nevis, and is registered with the Nevis Financial Services Regulatory Commission under registration number C46027. NPRE maintains its principal place of business in Charlestown, Nevis, Saint Kitts and Nevis. Accordingly, for purposes of 28 U.S.C. § 1332(c)(1). NPRE is a citizen of the foreign state of Saint Kitts and Nevis. NPRE is a subsidiary of Defendant NFG.

12. Defendant Specialty Risk Partners (USA) Inc. ("SRP") is a corporation and NFG subsidiary organized under the laws of the State of Nevada, with its principal place of business in Beverly Hills, California.

13. Defendant Specialty Risk Reinsurance Inc. ("SRR"), is a corporation and subsidiary of SRP organized under the State of Tennessee, with its principal place of business in Nashville, Tennessee.

14. Defendant Jonathan Mark Gordon Clubb is a citizen and resident of Jersey, Channel Islands, and serves as a director of GSP.

15. Defendant Mark Payn is a citizen and resident of Jersey, Channel Islands, serves as a director of GSP, and is an employee of Garfield Bennett Trust Company.

16. Defendant Frankie Major is a citizen and resident of the United Kingdom, is an employee of NFG, and serves as a director of GSP.

**JURISDICTION AND VENUE**

17. This Court has subject matter jurisdiction of this civil action pursuant to 28 U.S.C.

§ 1332(a). As set forth in Paragraph 7 above, NMS's citizenship—determined by the citizenship of each of its general and limited partners, and, in turn, by the citizenship of each member of its general partner, NMS Capital Management GP, LLC—is completely diverse from that of every Defendant. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18. This Court has personal jurisdiction over Defendant GSP because, in Section 8.9 of the Amended PSPA, GSP expressly and irrevocably consented to the jurisdiction of the "United States District Court located in the Borough of Manhattan in the City of New York, New York, and appellate courts from any thereof," and agreed to "irrevocably waive any objection which it may have at any time to the laying of venue of any suit, action or proceeding arising out of or relating to this [Agreement] brought in any such court."

19. This Court has personal jurisdiction over NFG pursuant to N.Y. C.P.L.R. § 302(a)(1) because NFG, as a signatory to the PSPA and the Amended PSPA—each contract expressly governed by New York law and providing for performance in New York—transacted business within the State of New York, and this action arises directly from that business. NFG further transacted business in New York through Beekmeyer's actions as NFG's Chief Executive Officer, described herein, which were undertaken within the scope of his office and in furtherance of NFG's interests. In addition, NFG has either directly, or through its affiliated subsidiaries, directly paid NMS varying Preferred Shareholder dividends and fees on behalf of GSP in accordance with the PSPA, Amended PSPA, and other Transaction Documents.

20. This Court has independent personal jurisdiction over NFG SA, as successor in interest to NFG Sarl, arising from NFG Sarl's status as a direct signatory to the March 1, 2024 Preferred Stock Purchase Agreement in its own capacity as the "NFG Share Issuer," a New York-

governed contract under which NFG Sarl expressly and irrevocably consented to the jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in the City of New York, and irrevocably waived any objection to venue in such courts, pursuant to Section 10.9 of that agreement.

21. This Court has personal jurisdiction over Beekmeyer pursuant to N.Y. C.P.L.R. § 302(a)(1) and (a)(2) because Beekmeyer, acting on behalf of NFG and GSP, transacted business within the State of New York in connection with the negotiation, execution, and performance of the PSPA and the Amended PSPA, each a New York-governed contract, and this action arises from that business. Beekmeyer further committed tortious acts, including tortious interference with contract and fraud as alleged herein, that were directed at NMS and caused injury in connection with contracts governed by New York law and providing for performance and dispute resolution in New York.

22. This Court has personal jurisdiction over Clubb pursuant to N.Y. C.P.L.R. § 302(a)(1) because Clubb, as a director of GSP, executed an amendment to the transaction documents on behalf of GSP between NMS, NFG, and GSP.

23. This Court has personal jurisdiction over Payn pursuant to N.Y. C.P.L.R. § 302(a)(1) and (a)(2) because Payn, as director of GSP, made representations to NMS and its counsel regarding GSP's performance of its obligations under the New York-governed transaction documents, as alleged herein, and this action arises from that conduct.

24. This Court has personal jurisdiction over Major pursuant to N.Y. C.P.L.R. § 302(a)(1) and (a)(2) because Major, as a director of GSP and Head of Corporate Advisory at NFG Partners SA, participated in the negotiation and execution of transactions under the New York-governed transaction documents and committed tortious acts that were directed at NMS and caused

injury in connection with contracts governed by New York law and providing for performance and dispute resolution in New York.

25. This Court has personal jurisdiction over NPRE because NPRE has been the direct recipient of approximately $150 million ($150,000,000) of MTN Notes delivered as an equity investment and received approximately $120 million ($120,000,000) of MTN Notes delivered as a capital contribution on behalf of NPRE to satisfy its own reinsurance trust capital obligations with multiple counterparties; both transactions directly in accordance with and follow the New York-governed transaction documents.

26. This Court has personal jurisdiction over SRP pursuant to N.Y. C.P.L.R. § 302(a)(1) because SRP received, as a direct equity investment, $100 million ($100,000,000) of MTN Notes transferred from GSP's brokerage account with Shard Capital directly into SRP's own account with Bank of New York Mellon in New York, pursuant to the New York-governed transaction documents, and this action arises from that transaction.

27. This Court has personal jurisdiction over SRR pursuant to N.Y. C.P.L.R. § 302(a)(1) because SRR received, as a solvency capital investment from its parent SRP, $50 million ($50,000,000) of the MTN Notes described above, transferred directly into SRR's own account with Bank of New York Mellon in New York, pursuant to the New York-governed transaction documents, and this action arises from that transaction.

28. The Preferred Stock Purchase Agreement dated March 1, 2024, and the Amended and Restated Preferred Stock Purchase Agreement dated February 11, 2025, expressly provide that they shall be construed in accordance with and governed by the laws of the State of New York.

29. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims—including the negotiation, execution,

and intended performance of contracts governed by New York law and providing for dispute resolution in New York—occurred in or were directed at this District. Venue is further proper as to GSP and NFG because, in Section 8.9 of the Amended PSPA, each irrevocably submitted to venue in the courts of the State of New York and the United States District Court located in the Borough of Manhattan in the City of New York and irrevocably waived any objection to the laying of venue in such courts and any claim that any such action was brought in an inconvenient forum.

## GENERAL ALLEGATIONS

### Background of the Transaction

30. On or around March 1, 2024, NMS, GSP, and NFG entered into a Preferred Stock Purchase Agreement (the "PSPA"). This PSPA was structured as a replacement transaction in which NFG, through its wholly owned subsidiary, NPFC SPV 1, Inc. ("NPFC"), had issued and sold Series F Preferred Shares to NMS in exchange for NMS Senior Secured Notes with the intention that NMS payment consideration would serve as the foundation of Beekmeyer's new Medium Term Note Program.

31. Under the PSPA, NFG served as sponsor to GSP and caused GSP to issue and sell 27,000 shares of Series A Preferred Stock (the "Preferred Stock") to NMS, with a stated value of $100 hundred thousand ($100,000) per share, for an aggregate stated value of $2.7 billion ($2,700,000,000)—structured to replace and cancel the Series F Preferred Share Transaction.

32. In exchange for the Preferred Stock, NMS delivered to GSP twenty-seven (27) Senior Secured Notes (the "NMS Notes") with a notional amount of $100,000,000 per note, for an aggregate notional amount of $2.7 billion.

33. Following the closing, GSP used the NMS Notes as payment consideration to purchase Medium Term Notes ("MTN Notes" or "MTNs") issued by Newpoint Surety Asset

Finance Ltd. (now Trustbridge Finance Ltd.) ("Newpoint"). GSP received $1,500,000,000 in Newpoint MTN Notes; the remaining $1,200,000,000 of the Purchase Price remained on deposit with Newpoint for the benefit of GSP and/or any counterparties who were MTN Notes holders as a result of any approved subsequent transaction with GSP.

34. On February 11, 2025, NMS, GSP, and NFG entered into an Amended and Restated Preferred Stock Purchase Agreement (the "Amended PSPA"), which amended and restated the PSPA in its entirety but did not alter the number of shares issued or their stated value.

35. NFG is the common shareholder of GSP, holding ten ordinary shares. NMS is the preferred shareholder of GSP, holding 27,000 Series A Preferred Shares.

**Contractual Terms – Redemption Rights and Accrued and Unpaid Dividends**

36. Under Section 3.1 of the Amended PSPA, any transaction in which the MTN Notes are to be sold, pledged, hypothecated, used as collateral, or used as a guarantee of any obligation of GSP or its affiliates must first be approved by the NMS investment committee.

37. Separately, under Section 3.1 of the PSPA, NFG Sarl (predecessor in interest to Defendant NFG), in its own capacity as the "NFG Share Issuer," agreed to issue and sell to NMS ten thousand (10,000) shares of NFG Sarl's Series A Convertible Redeemable Preferred Stock (the "NFG Preferred Stock") for cash consideration of $10,000. Neither NFG Sarl nor its successor, NFG SA, ever issued share certificates for the NFG Preferred Stock or recorded NMS on NFG's share register as a holder of the NFG Preferred Stock.

38. Under the PSPA and the Amended PSPA, the Series A Preferred Stock accrues dividends and fees at the following specified rates: (a) periodic dividend calculated as a percentage of the total stated value of GSP's Series A Preferred Stock, payable monthly; (b) a commitment-type fee calculated as a percentage per annum of the principal amount of notes sold to

counterparties and remaining outstanding, payable quarterly; and (c) profit participation dividend equal to ten percent (10%) of income earned by GSP, its parent company, or affiliates from their use of the MTN Notes, payable bi-annually.

39. The Parties further agreed that any of the foregoing dividends or fees remaining unpaid for thirty (30) days from the date due (the "Delinquent Fees") would incur payment penalties as follows: (a) one percent (1%) per month of the Delinquent Fees for the earlier of sixty (60) days or until paid in full; and (b) two percent (2%) per month of the Delinquent Fees remaining outstanding for sixty (60) days or more, until paid in full.

40. The Parties additionally agreed that any Delinquent Fees remaining outstanding for more than ninety (90) days may, at NMS's sole discretion, be satisfied through delivery of Common Stock of GSP in lieu of cash, calculated based on the net equity value of GSP's most recent audited financial statements, less the capital amount attributed to the Series A Preferred Stock, divided by the total shares of Common Stock outstanding, and multiplied by three (3) times the amount of Delinquent Fees owed.

41. Section 7.1(c) of the Amended PSPA defines an "Event of Default" to include, among other things, GSP's failure to observe or perform any material covenant, agreement, or warranty contained in its Articles of Association, where such failure remains uncured within the applicable notice and cure period, and/or where GSP or its affiliates enter into any transaction wherein the MTN Note is sold, pledged, hypothecated, used as collateral or guarantees any obligation of GSP without first obtaining approval from NMS's investment committee and the unanimous written approval from the GSP board of directors, and/or the occurrence of any material breach or event of default by GSP under the Amended PSPA or any other Transaction Document and such failure or breach shall not have been remedied within the applicable cure period provided

for therein.

42. Under Section 7.1(d) of the Amended PSPA, in the Event of Default, NMS has the remedy option is to automatically: "(1) purchase one hundred percent (100%) of the Common Stock of [GSP] issued and outstanding from [NFG] for the price of one United States dollar ($1) per share (the 'Default Share Purchase Price')," effected within ten business days from NMS providing notice of such election to NFG and GSP; or "(2) force the redemption of the Series A Preferred Stock at a redemption price equal to the Purchase Price plus any accrued and unpaid dividends (the 'Default Redemption')."

**GSP's Representations and Warranties**

43. Under Section 4.1 of the Amended PSPA, GSP agreed that during such time as the Series A Preferred Stock are outstanding, it would not "(a) issue shares of any class without the written approval of [NMS];" and "(b) sell, dispose of, encumber or otherwise hypothecate the shares of any class."

44. Under Section 5.1(f) of the Amended PSPA, GSP expressly represented and warranted as follows:

> (f) Consents and Approvals. The Company is not required to obtain any consent, waiver, authorization or order of, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person, in connection with the execution, delivery and performance by the Company of this Agreement and each of the other Transaction Documents, except, if applicable, the filing of an 8K Notice with the Securities and Exchange Commission prior to the Closing Date and/or a date to be agreed.

45. Under Section 5.1(e) of the Amended PSPA, GSP represented and warranted that by entering into the Agreement and other transaction documents, there would be no conflict with or violate any provision of GSP's Articles of Association or bylaws, nor would it be subject to obtaining any consents, and GSP would not be in violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction.

46. Such agreements, representations, and warranties were material inducements for NMS to enter into the PSPA and to deliver the NMS Notes to GSP and then subsequently enter into the Amended PSPA and Letter Agreement.

**Transaction 1: NPRE Equity Investment and Reinsurance Capital**

47. On or around May 21, 2024, GSP entered into a transaction with Newpoint Reinsurance Company Limited ("NPRE"), where it agreed to transfer $150,000,000 of MTN Notes to NPRE—a wholly-owned subsidiary of NFG (GSP's own parent company)—in exchange for 150,000,000 common shares of NPRE (the "NPRE Equity Investment").

48. On or around May 21, 2024, GSP transferred an additional $115,000,000 of MTN Notes, and on July 25, 2024, an additional $5,000,000 of MTN Notes, to various reinsurance trust accounts for multiple reinsurance counterparties of NPRE to satisfy NPRE's capital requirements for said reinsurance trusts, for a total of $120,000,000 in MTN Notes transferred as NPRE reinsurance capital (the "NPRE Reinsurance Capital").

49. NMS's investment committee gave its consent pursuant to Section 4.1 of the PSPA based on its understanding—communicated by NFG and GSP—that NPRE would deliver to GSP an annual fee equal to four percent (4%) of the notional amount of the MTN Notes, plus ten percent (10%) of any equity shares acquired in exchange for the MTN Notes. GSP would then pay NMS the agreed-upon Preferred Share Dividends and Fees from that fee and would pass the NPRE equity shares through to NMS as a Series A preferred stock dividend.

50. NMS's investment committee separately consented to the NPRE Equity Investment and NPRE Reinsurance Capital transactions on the understanding, communicated by NFG and GSP, that NPRE would pay GSP (a) an amount equal to four percent (4%) per annum of the notional amount of the MTN Notes; and (b) ten percent (10%) of any income earned by NPRE

both at the corporate equity level and from the various reinsurance trust transactions.

51. NMS's investment committee further consented on the understanding that all proportionate Series A Preferred Stock dividends and fees would be paid to NMS, and that GSP would allocate and deposit no less than three percent 3%, or 75% of the 4% annual fee, into a segregated capital reserving account in the name of GSP.

52. At the time of the NPRE transactions, Beekmeyer and NFG—the parent company to GSP—represented to NMS that the NPRE Equity Investment and NPRE Reinsurance Capital transactions were urgent but that proper documentation memorializing the agreed terms and conditions between NMS, GSP, and NPRE would be completed as soon as possible.

53. Despite multiple requests from NMS, no such documentation has been completed or provided to NMS.

54. In 2025, NPRE transferred the $100 million ($100,000,000) MTN Notes back to GSP in connection with the NPRE Equity Investment as of June 30, 2025, and then $50 million ($50,000,000) MTN Notes back to GSP as of September 30, 2025, without ever collecting and accounting from NFG or NPRE for the monies or shares owed to GSP. GSP and its directors—Clubb, Payn, and Major—have made no effort to collect from NPRE the contractually agreed fees and profit participation owed to GSP for NPRE's use and profiting from the MTN Notes, including the four percent (4%) annual fee which equals $6 million ($6,000,000) per year prorated from May 2024 to June 30, 2025 and September 30, 2025, respectively, ten percent (10%) of any income earned from the use of the MTN Notes, and the ten percent (10%) of any income earned by NPRE, an amount believed to exceed $20,000,000 but which will be determined through discovery and at trial.

55. Separate from, and in addition to, the NPRE equity investment, NPRE continues to

benefit from $120 million ($120,000,000) of MTN Notes in connection with the NPRE Insurance Capital Transactions owing the same annual fee structure of four percent (4%) per annum ($4,800,000 per year) and ten percent (10%) profit participation earned from the use of the MTN Notes to GSP from May 2024 to present, despite multiple notices of the NMS Investment Committee's notice of rescission of its consent on account of the multiple breaches and event of default.

56. NPRE, NFG, and/or GSP made direct payments to NMS of certain contractually due dividends on a regular basis, before such payments ceased or fell into arrears on or about October 2025.

57. As a result, GSP and its directors—Clubb, Payn, and Major—have failed to collect and preserve amounts owed to GSP and NMS, including but not limited to: (a) the unpaid 3% capital reserving fees owed by NPRE to GSP since May 2024; (b) ten percent (10%) of the income earned by NPRE from its use of the MTN Notes, measured both at the corporate equity level and the reinsurance trust level, owed to GSP; and (c) the ten percent (10%) of the 150 million (150,000,000) NPRE ordinary shares with a purchase price of $1.00 per share which is equal to 15,000,000 NPRE ordinary shares owed to GSP, constituting a part of NMS's ten percent (10%) profit participation in the NPRE Equity Investment—all in an amount believed to exceed $20,000,000, to be determined through discovery and at trial.

**Transaction 2: Saturn, Tradex and Soteria Transactions**

58. On or around September 30, 2024, GSP entered into an agreement whereby it transferred approximately $120,128,137.00 of MTN Notes to Saturn Holdings PLC and its subsidiaries, Tradex, and Soteria Insurance ("Saturn Holdings").

59. The Saturn Holdings transaction included terms that would include Tradex and/or

Soteria contract with NPRE for reinsurance business opportunities with NPRE, which has generated millions of dollars in revenue for NPRE.

60. NMS's investment committee consented to the Saturn Holdings transactions on the basis that GSP would be required to pay NMS (a) a commitment-type fee; (b) a profit participation dividend in the form of share participation; and (c) a profit participation dividend in the form of income participation.

61. The commitment-type fee is calculated as an amount equal to fifty (50) basis points per annum based on approximately $120,128,137.00, prorated on a quarterly basis.

62. The profit participation dividend in the form of share participation entitles NMS to ten percent (10%) of the shares purchased from the Saturn Holdings parties.

63. The profit participation dividend in the form of income entitles NMS to ten percent (10%) of the income earned from the overall Saturn Holdings transactions.

64. NFG and NPRE, on behalf of GSP, paid NMS the commitment-type fee, the 10% share participation, and the 10% income participation described above in 2024 and part of 2025, before such payments ceased or fell into arrears on or about September 2025, with a significant balance outstanding as to each.

65. The Saturn Holdings parties have continued to hold and use the $80,000,000 and $40,000,000 in MTN Notes transferred to them, respectively, without any accounting from Tradex or Soteria for the monies, income, or shares owed to GSP and GSP and its directors—Clubb, Payn, and Major—have made no effort to collect from Tradex or Soteria the contractually agreed fees and profit participation owed to GSP, in an amount believed to exceed $16,337,432.00, but which will be determined through discovery and at trial.

66. At present, GSP currently holds 9,104,556 shares of Saturn Holdings PLC of which

10% or 910,455 share are contractually due to NMS. GSP has failed to deliver to NMS this share participation or cash equivalent from the Saturn, Tradex, and Soteria transactions.

67. GSP has failed to deliver to NMS the ten percent (10%) profit participation dividend tied to income earned from the overall Saturn, Tradex, and Soteria transactions.

68. GSP has failed to deliver to NMS the commitment-type fee due from the Saturn, Tradex, and Soteria transactions for the period of 2025 to present.

**Transaction 3: SRP and SRR Transaction**

69. On or around February 14, 2025, NFG and Beekmeyer instructed Major to cause GSP to transfer $100,000,000 of MTN Notes to Specialty Risk Partners (USA) Inc. ("SRP"), an NFG subsidiary from the GSP brokerage account held with Shard Capital to SRP's account with Bank of New York Mellon in New York.

70. Subsequently, NFG instructed SRP to transfer $50,000,000 of the MTN Notes to its wholly owned subsidiary, Specialty Risk Reinsurance Inc. ("SRR"), a Tennessee licensed insurance company, as a solvency capital investment to their Bank of New York Mellon account in New York.

71. NMS's investment committee consented to the SRP transaction on the basis that (a) SRP would pay GSP an amount equal to four percent (4%) per annum of the notional amount of the MTN Notes; (b) SRP would deliver to GSP ten percent (10%) of any income earned by SRP from use of the MTN Notes; and (c) GSP would deliver all documentation sufficient to identify the number of shares acquired in SRP and to reflect NMS's 10% participation interest in those shares in the name of NMS.

72. SRP and SRR returned the MTN Notes to GSP in December 2025 without any accounting or payment.

73. GSP delivered to SRP an invoice dated July 31, 2025, in the amount of $493,151.00 (Invoice #1) for the period of Feb 14, 2025, through March 31, 2025, which is believed to be outstanding and unpaid. GSP delivered to SRP a second invoice (Invoice #2) dated July 31, 2025, in the amount of $986,301 for the period of April 1 through June 30, 2025, of for the second quarter of the year. It is believed this amount is unpaid and outstanding. This same formula would be used in calculating amounts due from July 1, 2025, until the date of return of the MTN Notes back to GSP.

74. GSP has failed to collect from SRP and SRR the contractually agreed fees and profit participation as detailed in their Invoices 1 and 2, or the prorate amount due from July 1, 2025, until return of the MTN Notes.

75. GSP failed to deliver to NMS its owed contractual preferred share dividends, commitment-type fees, profit participation dividends, and contractual documentation, in connection with GSP's transactions with SRP and SRR.

**Collusion**

76. Beekmeyer terminated Ogier (Jersey) LLP ("Ogier")–former corporate secretary of GSP and trustee to TrustBridge—in December 2024.

77. Beekmeyer engaged Garfield Bennett Trust Company ("GB") to take Ogier's place after Mark Clubb assured Beekmeyer that Clubb's connection with a GB employee would allow GB to quickly approve and onboard GSP and TrustBridge.

78. In exchange, Beekmeyer arranged a loan from NFG to Clubb's company, Team PLC, in an amount between $250,000 to $1,000,000 in or around December 2024.

79. In January 2025, GB approved and onboarded GSP and TrustBridge as clients, with NFG as common shareholder and NMS as preferred shareholder, and GB assumed the role of

corporate secretary. Club and Payn were appointed as directors of GSP.

80. In February 2025, Clubb—as newly appointed director of GSP—signed an additional transaction document, the Letter Agreement, on behalf of GSP between NMS, NFG, and GSP.

81. In or around late summer of 2025, in advance of the anticipated forthcoming payment dispute arose, Beekmeyer placed his employee—Frank Major—on the board of GSP without any notice to NMS. Had NFG or GSP notified NMS of the addition of Major to GSP's board, NMS would have exercised its own preferred shareholder right to add a director concurrently on the board and pushed back on Major for not have the requisite experience to serve on the board of a company like GSP.

82. In collaboration with Beekmeyer, approximately August or September 2025, Major began a communication campaign with other GSP board members and GB, advising for the first time, a purported need to verify underlying U.S. Treasury assets backing the NMS Notes, framing it as a Anti-Money Laundering and Know Your Customer requirement (the "AML/KYC defense"). This was clearly pretextual: GB had already completed AML/KYC due diligence and approved GSP and its shareholders approximately six months earlier, and Major—as an NFG employee and Head of Corporate Advisory at NFG Partners SA, the FINMA-regulated Dealer and Arranger for the MTN Note Program—already had privileged access to all relevant due diligence dating back before the March 2024 closing, having been directly involved in advising on every MTN Note transaction since.

83. After making payments to NMS—either directly, or through NPRE and NFG making such payments on GSP's behalf—for the period following the initial closing of March 2024 up until August 2025, GSP and its directors—Payn and Clubb—abruptly asserted an

AML/KYC defense as an excuse for nonpayment to NMS beginning in or around September 2025, even though no provision in the Amended PSPA afforded GSP that option.

**Governance Failures and Board Misconduct**

84. In connection with the NPRE transactions, the GSP Board of Directors has failed to take any action to properly document the transactions with NPRE, enforce and collect the agreed-to fees due to GSP by NPRE, and has ignored any responsibility to correct this neglect.

85. NPRE continues to use the $120,000,000 of MTN Notes associated with the NPRE Reinsurance Capital transaction for its own benefit, generating millions of dollars in income for NPRE and without ever compensating GSP—or NMS—for that use.

86. With respect to the $100,000,000 in MTN Notes provided to SRP, there has been no repayment or accounting of the four percent (4%) annual fee or the ten percent (10%) of the shares that should have been retained by GSP and ultimately paid to NMS.

87. All of the governance failures with GSP follow and it is believed it is in collaboration with Beekmeyer's decision to intentionally avoid obligations and breach agreements and from certain GSP Board Members to take any proper action to enforce and collect the amounts due and owed to GSP as doing so is both separate and apart from superseding and taking priority to any alleged regulatory AML/KYC concerns related to the NMS Notes.

88. Certain members of the GSP Board and GB have taken unfair and adversarial actions against NMS in connection with any alleged regulatory AML/KYC concerns failing to include and properly direct that same scrutiny toward NFG—either instead of, or in addition to, NMS—despite NFG's role as Sponsor to the transaction. Further damage has resulted from unaccountable "expense reimbursements" and other distributions have been made to NFG, approved by both GB and the majority of the GSP Board, during the same period that GB and

certain GSP Board members were challenging the overall securitization and transaction structure. These damages have been compounded by GSP's decision to permit NPRE and SRR to return the MTN Notes without any payment or accounting of amounts due, leaving GSP now wholly reliant on NFG and NPRE to pay to GSP all amounts owed to GSP, as agreed.

89. Defendants Beekmeyer, Major, Clubb, and Payn are working together in an ongoing pattern of avoidance of addressing the outstanding defaults and maintain their focus solely on the pretextual AML/KYC defense, despite the fact that the terms of the PSPA and the Amended PSPA do not provide such rights.

90. In or around November 2025, during a video conference attended by Trevor Saliba, NMS-appointed GSP director Ian Burton, GSP director Carl Corbell, and Defendant Mark Payn, Payn represented and confirmed that GSP had more than sufficient funds to meet the outstanding obligations owed to NMS as holder of the Series A Preferred Stock. Based on the amounts owed, this was believed to be a misrepresentation. In addition, based on information available today, it is believed that GSP does not have anywhere near the necessary funds to meet its contractual preferred shareholder obligations to NMS without collecting all amounts owed to it by NPRE, NFG, and/or SRR and SRP.

91. In or around December 2025, during a call with NMS's Jersey counsel, Kate Anderson, Payn made substantially similar representations and indicated that he would provide bank statements or other documentary support.

92. To date, no such documentary support has been provided by Defendant Payn or GSP. On information and belief, GSP directors Payn and Clubb have failed to properly manage the financial affairs of GSP.

93. In reliance on the apparent assurance that GSP had sufficient funds and that

supporting evidence would be produced, NMS delayed exercising its legal rights under the Amended PSPA.

**Failure to Provide Financial Information**

94. Despite repeated requests, GSP has failed to provide NMS with accurate accounting information for the year ending December 31, 2024, or December 31, 2025.

95. As a result of GSP's failure to engage, NMS cannot verify GSP's compliance with its contractual obligations under the PSPA and the Amended PSPA, cannot ascertain the capital reserve amounts required to be held, and cannot provide accurate invoices for the profit participation dividends due for 2025 and 2026.

96. GSP has failed to provide (a) confirmation of the solvency position of GSP; (b) confirmation of all transactions entered into using the MTN Notes, including with NPRE, Saturn, Tradex, Soteria, SRP, and SRR; (c) audited or management accounts for GSP for the financial years 2024 and 2025; (d) financial information for the first quarter of 2026; (e) a reconciliation of all income received, fees paid, and capital reserve amounts held in connection with the NPRE, Saturn, Tradex, Soteria, SRP, and SRR transactions; (f) confirmation of the current balances held in respect of each capital reserve account; (g) bank statements evidencing the segregated capital reserve amounts held in the dedicated reserve account; (h) confirmation of the calculation and payment history of the Series A Preferred Stock dividends owed to NMS under the Amended PSPA; and (i) payment history sufficient to calculate accrued Delinquent Fees owed on each category of unpaid amounts.

97. NMS has been informed by its director representative, that the GSP Board and GB staff have offered informal reasons for GSP's inability to provide accurate financials is solely dependent on it obtaining the exaggerated and unprecedent information requests in connection

with the alleged regulatory AML/KYC request. However, this is a blatant misstatement of fact: (a) no such information would provide any information that would affect any transaction utilizing the MTN Notes, nor any income or expenses; and (b) Saturn, Tradex and Soteria—all entities utilizing and/or recognizing the MTN Notes on their respective balance sheets—have been able to conclude audited reports and filings for 2025. As a result, NMS has no reason to credit any statement made by the GSP Board, and can only construe the alleged regulatory AML/KYC matter—which GSP is required to resolve under the Amended PSPA—as being used to avoid, misinform, and misrepresent information rightly due to NMS as a preferred shareholder.

**Prior Notices and Continuing Defaults**

98. On July 1, 2025, NMS sent a Notice of Default to GSP concerning unpaid preferred share dividends and fees.

99. Although only a partial payment was made, NMS agreed to withdraw its default notice, at the request of Clubb, on the assurances that the payments due would be made. NMS relied on representations that remaining amounts would be paid, the agreed balances were never satisfied.

100. On October 1, 2025, NMS sent an additional Notice of Default and Demand for Cure regarding GSP's failure to deliver profit participation dividends, including the ten percent share participation or cash equivalent relating to the transactions involving third-party entities, and the return of $100,000,000 of MTN Notes provided to SRP.

101. GSP failed to cure and return the MTN Notes within the applicable cure period, resulting in an Event of Default.

102. On January 16, 2026, NMS sent a Notice of Rescission of Consent and Notice of Default relating to MTN Notes provided to NPRE in connection with the NPRE Equity Investment

and Reinsurance Capital transactions.

103. On January 27, 2026, NMS served an additional Notice of Default, Demand, and Election of Default Share Purchase (Common Stock), electing the Default Share Purchase.

104. NMS tendered the Default Share Purchase Price by cashier's check in the amount of $10.00, representing $1.00 per issued ordinary share.

105. GSP and NFG have failed to complete the transfer, update the register of members, process or return transfer documentation, or provide any formal basis for refusal.

106. On February 23, 2026, NMS Sent a Notice of Default, Demand to Cease and Desist, Demand to Rescind Purported Instructions/Put Notice Regarding MTNs in response to GSP's attempt to sell, monetize, transfer, encumber or procure cash settlement without NMS' Investment Committee prior written consent pursuant to the terms of the Amended PSPA.

107. On July 3, 2026, NMS sent an additional notice detailing multiple continued and uncured Events of Default, including GSP's failure to perform, unauthorized use of the MTN Notes in transactions, failure to provide financial reporting, failure to pay amounts due, failure to complete NMS's January 27, 2026 Default Share Purchase election, and failure to preserve GSP's assets and records.

108. On September 3, 2026, NMS served a formal and final Notice of Default Redemption on GSP, demanding redemption of the 27,000 Series A Preferred Shares at the Purchase Price of $2.7 billion, plus accrued and unpaid dividends and fees, pursuant to Section 7.1(d) of the Amended PSPA.

109. These defaults remain continuing and uncured.

**Amounts Due to NMS**

110. As of approximately September 1, 2026, GSP owes NMS approximately

$1,794,899.88 in preferred share dividends, accrued and outstanding, including Delinquent Fees.

111. As of approximately September 1, 2026, GSP owes NMS approximately $669,202.75 in commitment-type fees for the third quarter of 2025, accrued and outstanding, including Delinquent Fees.

112. As of approximately September 1, 2026, GSP owes NMS approximately $4507,669.28 in commitment-type fees for the fourth quarter of 2025, accrued and outstanding, including Delinquent Fees.

113. As of approximately September 1, 2026, GSP owes NMS approximately $324,670.08 in commitment-type fees for the first quarter of 2026, accrued and outstanding**.**

114. As of approximately September 1, 2026, GSP owes NMS approximately $301,479.36 in commitment-type fees for the second quarter of 2026, accrued and outstanding.

115. As of approximately September 1, 2026, GSP owes NMS approximately $197,503.34 in commitment-type fees for the third quarter of 2025, accrued and outstanding.

116. As of approximately September 1, 2026, GSP owes NMS approximately $1,204,195.38 in profit participation dividends for NPRE Reinsurance Capital for July 1 through December 31, 2024, due March 31, 2025, plus continuing accruals.

117. As of approximately September 1, 2026, GSP owes NMS approximately $1,468,461.24 in profit participation dividends for the NPRE Equity Investment for July 1 through December 31, 2024, due March 31, 2025, plus continuing accruals.

118. As of approximately September 1, 2026, GSP owes NMS 15,000,000 NPRE common shares or the cash equivalent $15,000,000 plus approximately $8,400,000 in Delinquent Fees due since May 2024.

119. As of approximately September 1, 2026, GSP owes NMS share participation or

cash equivalent relating to the Saturn/Tradex/Soteria transactions of approximately $12,012,813 plus approximately $5,766,150.54 in Delinquent Fees due since October 2024.

120. As of approximately September 1, 2026, GSP owes NMS share participation or cash equivalent for SRP and SRR of approximately $10,000,000 plus approximately $3,800,000 in Delinquent Fees due since February 2025.

121. As of September 1, 2026, the total amount due to NMS from GSP is $661,446,869.88.

122. The amounts owed to NMS remain subject to upward adjustment based on GSP's complete financial records, 2025 and 2026 financial reporting, transaction-level reconciliations, reserve-account statements, and information regarding shares, warrants, fees, income, and other consideration received or receivable in connection with the MTN deployments.

123. NMS has been deprived of the use of its capital and has incurred attorneys' fees and costs in attempting to enforce its rights.

124. NMS has suffered reputational harm and loss of business opportunities as a result of Defendants' breaches and misconduct.

**Deceit and Conflicts of Interest**

125. There exist undisclosed commercial arrangements, conflicts of interest, side agreements, undisclosed compensation arrangements, indemnities, consulting arrangements, or other relationships between one or more GSP directors and NFG, NPRE, SRP, SRR, or their respective principals or affiliates.

126. Defendants Clubb, Payn, and Major have failed to act independently of NFG and its principal, Beekmeyer, and have permitted the interests of NFG or its affiliates to be preferred

over the interests of GSP.

127. The GSP Board's failure to document material MTN deployments, enforce GSP's rights to collect agreed remuneration from NPRE, SRP, and SRR, and preserve GSP's receivables and reserves reflects a pattern of misconduct in which NFG, through Beekmeyer, has caused GSP to be managed and controlled for the benefit of NFG and its affiliates, rather than for the benefit of GSP and its shareholders. GSP's board failed to document, enforce, or collect on nearly $500,000,000 in MTN Note transactions with NPRE, SRP, and SRR.

**COUNT I – BREACH OF CONTRACT**

**(Against GSP and NFG)**

128. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

129. At all relevant times, the PSPA and the Amended PSPA are valid and enforceable contracts between NMS, GSP, and NFG.

130. NMS performed all of its obligations under the contracts, including delivering the NMS Notes and providing investment committee approval for transactions subject to agreed conditions.

131. GSP breached its obligations under the Amended PSPA by failing to pay the monthly preferred share dividends including all delinquent fees, totaling approximately $1,794,899.88.

132. GSP breached its obligations under the Amended PSPA by failing to pay the quarterly commitment-type fees including all delinquent fees owed to NMS in connection with all transactions, totaling approximately $6,000,524.81.

133. GSP breached its obligations under the Amended PSPA by failing to pay the 2024

profit participation dividends including all delinquent fees owed to NMS, totaling approximately $2,672,656.62.

134. GSP breached its obligations under the Amended PSPA by failing to deliver to NMS 15,000,000 NPRE ordinary shares constituting NMS's ten percent (10%) profit participation in the NPRE Equity Investment, plus applicable Delinquent Fees totaling approximately $23,400,000.00.

135. GSP breached its obligations under the Amended PSPA by failing to deliver to NMS ten percent (10%) of the shares acquired in the Saturn, Tradex and Soteria transactions, or the cash equivalent thereof, plus Delinquent Fees totaling approximately $17,778,788.57.

136. GSP breached its obligations by failing to deliver to NMS ten percent (10%) of the shares acquired in the SRP and SRR transactions, or the cash equivalent thereof, plus applicable Delinquent Fees totaling $13,800,000.00.

137. GSP breached its obligations under the Amended PSPA by failing to provide financial reporting for 2025 and year-to-date 2026.

138. GSP breached its obligations by failing to properly document approved transactions and establish and maintain the required capital reserve accounts, consistent with the terms upon which NMS's investment committee provided its consent, and by failing to preserve GSP's receivables.

139. Separately, NFG (as successor to NFG Sarl) breached its obligations under Section 3.1 of the PSPA by failing to issue and deliver to NMS the 10,000 shares of NFG Preferred Stock for which NMS paid the $10,000 purchase price, and by failing to record NMS as a holder of the NFG Preferred Stock on NFG's share register.

140. Under Section 7.1(d) of the Amended PSPA, upon an uncured Event of Default,

NMS was entitled, in its sole discretion, to elect either (1) to purchase one hundred percent (100%) of GSP's issued and outstanding common stock from NFG for the Default Share Purchase Price of one dollar ($1.00) per share; or (2) to force the redemption of the Series A Preferred Stock at a redemption price equal to the Purchase Price plus any accrued and unpaid dividends (the "Default Redemption").

141. NMS initially elected the Default Share Purchase by written notice served on GSP and NFG on January 27, 2026, and tendered the Default Share Purchase Price by cashier's check in the amount of $10.00, representing $1.00 per issued ordinary share.

142. GSP and NFG breached their obligations under Section 7.1(d) of the Amended PSPA by failing to complete the transfer, update GSP's register of members, process or return the tendered transfer documentation, or provide any formal basis for their refusal to do so. GSP's and NFG's continuing failure to honor NMS's election constitutes a further, continuing, and uncured Event of Default entitling NMS to force the Default Redemption of the Series A Preferred Stock.

143. NMS validly elected the Default Redemption by its Notice of Default Redemption served on GSP on September 3, 2026, demanding redemption of the 27,000 Series A Preferred Shares at a redemption price equal to the Purchase Price of $2.7 billion, plus all accrued and unpaid dividends and fees.

144. Based on the track record shown, there is no faith that GSP or NFG shall perform their contractual obligations and GSP will fail and refuse to pay the Default Redemption Amount demanded.

145. Under Section 5.3(d) of the Amended PSPA, NFG expressly represented and warranted that neither NFG nor any subsidiary was required to obtain any consent, waiver, authorization, or order of any governmental authority in connection with the execution, delivery,

and performance of the Amended PSPA and the other related transaction documents.

146. NFG, through Beekmeyer and Major, breached this representation and its ongoing obligations under the Amended PSPA by asserting the unprecedented and purported AML/KYC verification requirement as a basis for withholding payment to NMS, in direct contradiction of NFG's own express warranty under Section 5.3(d).

147. GSP's and NFG's breaches, as set forth above, were material and not excused by any condition precedent or subsequent event.

148. As a direct and proximate result of GSP's and NFG's breaches, NMS has suffered and continues to suffer damages, including but not limited to unpaid commitment-type fees, preferred share dividends, profit participation dividends, and Delinquent Fee penalties, interest, the value of undelivered shares or cash equivalents (including the value of the 10,000 shares of NFG Preferred Stock wrongfully withheld), the value of the Default Share Purchase wrongfully withheld, and consequential damages, in an amount to be determined at trial but believed to exceed $61,446,869.88.

**COUNT II – FRAUD**

**(Against Beekmeyer, Clubb, Payn, and Major)**

149. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

150. Beekmeyer, as NFG's Chief Executive Officer and the individual exercising control over GSP's dealings with NFG's affiliates, represented to NMS in or around May 2024 that the NPRE Equity Investment and NPRE Reinsurance Capital transactions were urgent and that documentation memorializing the agreed terms between NMS, GSP, and NPRE would be

completed as soon as possible.

151. Beekemeyer's representation was false when made as Beekmeyer had no intention to properly document the transaction or for NPRE to pay the agreed to remuneration agreed to by NFG, NPRE and NMS to GSP: Beekmeyer knew, or acted with reckless disregard for the fact, that GSP would never complete such documentation because doing so would have required disclosing that NPRE was never going to be held to any written accounting of the fees, equity, and profit participation that NMS's investment committee had conditioned its consent upon, which would have exposed the self-dealing nature of transactions benefiting NFG's own subsidiaries and affiliates at GSP's and NMS's expense.

152. In or around September 2025, Defendant Major, at the direction of and in coordination with Beekmeyer, commenced on a communication campaign demanding that GB and the GSP board must obtain documents that confirm the existence of underlying U.S. Treasury assets was required under applicable AML/KYC regulations before GSP could resume or continue making payments to NMS.

153. This representation was false when made. No such AML/KYC verification requirement in the form Major was demanding had ever previously been raised by GSP, NFG, GB, or their counsel at any point during the more than year-long course of dealing between NMS and GSP, including during the months in which GSP, and NFG or NPRE on behalf of GSP's behalf, made payments to NMS without any such requirement being asserted. Moreover, the entire securitization structure was designed by Beekmeyer, and Major was intimately involved in multiple NFG transactions where the securitization structure was defended as adequate—without the aforementioned "confirmation" documents—to multiple counterparties, service providers, and regulators. The falsity of this representation is further confirmed by NFG's own express warranty

under Section 5.3(d) of the Amended PSPA—made by NFG only seven months earlier—that neither NFG nor any subsidiary was required to obtain any consent, waiver, authorization, or order of any governmental authority in connection with performance of the Amended PSPA. Major and Beekmeyer knew the purported requirement was pretextual and asserted it solely to fabricate an excuse to mislead the GSP Board and GB and to interfere with NMS's contractual rights by causing GSP's nonpayment.

154. In or around February 2025, Defendant Clubb accepted appointment as a director of GSP and executed, on GSP's behalf, an amendment to the transaction documents governing the NMS, NFG, and GSP relationship, without disclosing to GSP that he had arranged, or was in the process of arranging, a loan from NFG to his own company in an amount between $250,000 and $1,000,000.

155. In addition, Clubb, who is a licensed and regulated professional in Jersey, would have been required to conduct his own regulatory and financial due diligence on GSP, its common and preferred shareholders, and its financial holdings, which includes the MTN Note structure. It would have been reckless and irresponsible of Clubb to carry out his duties as a Director of GSP, or to execute any written agreement on GSP's behalf, without having been fully satisfied with all regulatory and financial matters related to GSP.

156. Clubb's silence created the false impression that he was acting as an independent director exercising independent judgment on GSP's behalf when executing amendments to transaction documents affecting NMS's rights, when instead, he was financially beholden to NFG at the time he signed the amendment.

157. In or around November 2025, Defendant Payn, during a video conference that included Trevor Saliba, NMS-appointed GSP director Ian Burton, and GSP director Carl Corbell,

represented and confirmed that GSP had more than sufficient funds to meet its outstanding obligations to NMS as holder of the Series A Preferred Stock.

158. In or around December 2025, during a call with NMS's Jersey counsel, Kate Anderson, Payn made substantially similar representations and indicated that he would provide bank statements or other documentary support for those representations.

159. These representations were false when made, or were made with reckless disregard for their truth. Payn knew, or was reckless in not knowing, that GSP did not have sufficient funds to meet its outstanding obligations to NMS as GSP had failed to collect monies from NPRE, NFG, and SRR/SRP in connection with their respective MTN Note transactions, and that GSP had been unable or unwilling to pay NMS the amounts due under the Amended PSPA and related transaction documents. Payn has never provided the promised bank statements or other documentary support, despite repeated requests.

160. Each of the foregoing representations and omissions was material, in that each concerned matters—the completion of transaction documentation, the legal basis for withholding payment, the independence of a director executing amendments to NMS's governing agreements, and GSP's actual financial capacity—that a reasonable investor in NMS's position would consider important in deciding whether to continue performing under, refrain from enforcing, or take legal action regarding the Amended PSPA and related transaction documents.

161. Beekmeyer, Major, Clubb, and Payn each made their respective representations and omissions with knowledge of their falsity or with reckless disregard for the truth, and with the intent that NMS rely on them.

162. Beekmeyer and Major intended, by creating the false narrative that led to pretextual AML/KYC defense, to induce NMS to refrain from immediately declaring default or pursuing

legal remedies while GSP purported to conduct a compliance review that Beekmeyer and Major knew was not genuinely required and was directly contradicted by NFG's own Section 5.3(d) warranty.

163. Payn intended, by representing that GSP had sufficient funds and would provide documentary support, to induce NMS to delay exercising its legal rights and remedies while GSP continued to withhold payment.

164. NMS justifiably relied on these representations and omissions by, among other things, continuing to forbear from immediately pursuing legal action against GSP after the AML/KYC defense was raised, continuing to perform under the transaction documents as amended by Clubb without objection to his independence, continuing to await documentation of the NPRE and SRP/SRR transactions that Beekmeyer never intended to provide, and delaying the exercise of its legal rights in reliance on Payn's representations that GSP had sufficient funds and that supporting documentation would be produced.

165. As a direct and proximate result of Beekmeyer's, Major's, Clubb's, and Payn's fraudulent representations and omissions, NMS has suffered and continues to suffer damages, including continuing nonpayment of preferred share dividends, commitment-type fees, profit participation dividends, and Delinquent Fee penalties, and delay in pursuing its legal remedies.

166. The conduct of Beekmeyer, Major, Clubb, and Payn, was undertaken knowingly, willfully, and in conscious disregard of NMS's rights, such that punitive damages are warranted. Defendants Beekmeyer, Major, Clubb, and Payn have the financial resources and ability to pay such punitive damages.

**COUNT III – FRAUDULENT INDUCEMENT**

**(Against GSP and NFG)**

167. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

168. Section 5.1(f) of the Amended PSPA states that GSP represented and warranted that it was not required to obtain any consent, waiver, authorization, or order of any governmental authority or other person in connection with the execution, delivery, and performance of the PSPA, the Amended PSPA, and any other transaction documents.

169. Under Section 5.3(d) of the Amended PSPA, NFG's own, independent representation and warranty that neither NFG nor any subsidiary was required to obtain any consent, waiver, authorization, or order of any governmental authority or other person in connection with the execution, delivery, and performance of the Amended PSPA and any of the related transaction documents.

170. GSP and NFG made these representations knowing them to be false, or with reckless disregard for their truth, because each knew at the time of contracting that no AML/KYC or other governmental verification or approval was, or would be, required before GSP could make payments to NMS.

171. These representations are material to the Amended PSPA because they are essential to GSP's and NFG's respective abilities to perform their payment and performance obligations without interruption or excuse.

172. GSP and NFG made the representation with intent to induce NMS to enter into the PSPA and the Amended PSPA and to deliver the NMS Notes.

173. NMS justifiably relied on the representation in deciding to enter into the PSPA and the Amended PSPA.

174. As a direct and proximate result of the fraudulent inducement—including NFG's

subsequent assertion, through Beekmeyer and Major, of commencing the campaign to promote the false narrative that has led to the pretextual AML/KYC defense in direct contradiction of GSP's and NFG's own Section 5.1(f) and Section 5.3(d) representations—NMS has suffered and continues to suffer damages, including but not limited to unpaid preferred share dividends, commitment-type fees, and profit participation dividends, plus default interest, and Delinquent Fee penalties.

**COUNT IV – ACCOUNTING**

**(Against GSP and NFG)**

175. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

176. GSP owes NMS specific, quantifiable contractual obligations under the PSPA and the Amended PSPA, including preferred share dividends, commitment-type fees, profit participation dividends, and Delinquent Fees, the precise amounts of which depend on income earned, shares acquired, and notes outstanding across GSP's dealings with NPRE, Tradex, Saturn, Soteria, SRP, and SRR.

177. The information necessary to calculate those amounts—including the income earned by NPRE, Saturn, Tradex, Soteria, SRP, and SRR from their use of the MTN Notes, the equity shares acquired in exchange for the MTN Notes, and the disposition of the MTN Notes upon their return to GSP in 2025—is known only to, and is solely within the possession, custody, and control of, GSP and NFG.

178. Despite NMS's repeated requests, GSP and NFG have failed and refused to: (a) confirm GSP's solvency position; (b) confirm all transactions entered into using the MTN Notes, including with NPRE, Saturn, Tradex, Soteria, SRP, and SRR; (c) provide audited or management

accounts for GSP for the financial years 2024 and 2025; (d) provide financial information for the first and second quarters of 2026; (e) provide a reconciliation of all income received, fees paid, and capital reserve amounts held in connection with the NPRE, Tradex, Soteria, SRP, and SRR transactions; (f) confirm the current balances held in respect of each capital reserve account; (g) provide bank statements evidencing the segregated capital reserve amounts held in the dedicated reserve account; (h) confirm the calculation and payment history of the Series A Preferred Stock dividends owed to NMS; and (i) provide a payment history sufficient to calculate accrued Delinquent Fees owed on each category of unpaid amounts.

179. GSP and NFG have failed to document the terms of the NPRE transactions, and have failed to provide any accounting for the monies, MTN Notes, and equity shares transferred to and returned by NPRE, Saturn, Tradex, Soteria, SRP, and SRR.

180. NFG, as GSP's common shareholder and through its purported control of GSP's board and management via Beekmeyer and directors beholden to NFG, directs and has knowledge of GSP's financial dealings with NPRE, Saturn, Tradex, Soteria, SRP, and SRR, and possesses or controls records necessary to determine the amounts due to NMS.

181. Despite NMS's repeated requests, NFG and GSP have failed and refused to provide any accounting of the transactions each personally negotiated, executed, approved, or oversaw on GSP's behalf.

182. A relationship of trust and confidence exists between NMS, on the one hand, and GSP and NFG, on the other, arising from NMS's position as GSP's controlling preferred shareholder, NMS's contractual entitlement to dividends, fees, and profit participations calculated by reference to transactions conducted exclusively by GSP and NFG.

183. The transactions at issue are complex, involve multiple counterparties and

successive transfers of MTN Notes among GSP, NPRE, Saturn, Tradex, Soteria, SRP, and SRR, and were never fully documented despite Defendants' assurances that documentation would be provided.

184. Due to this complexity and Defendants NFG's and GSP's exclusive control over the relevant financial information, NMS cannot ascertain the full amount due to it, or to GSP for GSP's benefit, without a full and complete accounting.

185. NMS has no adequate remedy at law because the precise amounts owed cannot be determined without an accounting of GSP's and NFG's books, records, and communications concerning the MTN Notes transactions, as well as the personal knowledge and records held by Clubb, Payn, and Major concerning the transactions each oversaw, and money damages alone, absent such an accounting, would not afford NMS complete relief.

186. NMS is entitled to a full and complete accounting from GSP and NFG of all monies, MTN Notes, equity shares, and other property received, held, transferred, or disbursed in connection with the NPRE, Tradex, Saturn, Soteria, SRP, and SRR transactions, and of all Preferred Share Dividends, Commitment Fees, Profit Participation Dividends, and Delinquent Fees due and owing to NMS thereunder.

**COUNT V – UNJUST ENRICHMENT**

**(Against GSP, NFG, NPRE, SRP, and SRR)**

187. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

188. NMS conferred substantial benefits on GSP and NFG by delivering the NMS Notes to GSP, which GSP then used as consideration to acquire the MTN Notes, and by providing the investment committee approvals that were a condition precedent to GSP's and NFG's affiliates'

use of those MTN Notes in the transactions described herein.

189. GSP and NFG have knowledge of, and have accepted and retained, the benefit of NMS's performance, including the value generated through GSP's and NFG's affiliates' use of the MTN Notes in the NPRE, SRP, and SRR transactions.

190. GSP and NFG have retained this benefit without paying NMS the preferred share dividends, commitment-type fees, profit participation dividends, and other consideration to which NMS is contractually entitled in exchange for that benefit.

191. NMS's investment committee approval was an express condition precedent to GSP's transfer of the MTN Notes to NPRE, SRP, and SRR, and that approval was granted specifically, and solely, in exchange for each entity's agreement to pay GSP, for NMS's benefit, fees, equity participation, and profit participation as set forth herein.

192. NPRE, SRP, and SRR each had knowledge of, and accepted the benefit of, NMS's investment committee approval. Beekmeyer and/or GSP's directors, who also directed and controlled NPRE, SRP, and SRR as NFG affiliates and subsidiaries, informed NPRE, SRP, and SRR that their receipt of the MTN Notes was conditioned on compensation flowing back for NMS's benefit. NPRE, SRP, and SRR accepted and retained the MTN Notes with that knowledge.

193. NPRE, SRP, and SRR have each retained the benefit of the MTN Notes transferred to them, and the income, equity, and business opportunities generated through their use, without providing the compensation upon which NMS's investment committee approval was conditioned.

194. It would be inequitable and against good conscience for GSP, NFG, NPRE, SRP, and SRR to retain these benefits without compensating NMS, given that NMS's own investment committee consent—not merely GSP's separate contractual relationships with these entities—was a necessary precondition to each entity's receipt and use of the MTN Notes.

195. NMS is entitled to restitution and disgorgement of the benefits unjustly retained by GSP, NFG, NPRE, SRP, and SRR, in an amount to be proven at trial.

**COUNT XI — CONVERSION**

**(Against GSP and NFG)**

196. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

197. NMS has a specific, identifiable ownership interest in: (a) 15,000,000 NPRE ordinary shares (or the cash equivalent thereof) constituting NMS's ten percent (10%) Profit Participation Dividend in the NPRE Equity Investment; (b) ten percent (10%) of the shares acquired in the SRP and SRR transactions (or the cash equivalent thereof) in exchange for $100 million ($100,000,000) of MTN Notes; (c) ten percent (10%) of the shares acquired in the Saturn, Tradex, Soteria transactions (or the cash equivalent thereof) in exchange for the $120,128,127.00 of MTN Notes (collectively, the "NMS Shares"); and (d) 10,000 NFG preferred shares.

198. NMS's right to the NMS Shares is fixed and was not contingent on further performance by NMS. GSP's obligation to deliver the NMS Shares, or their cash equivalent, to NMS matured upon GSP's and NFG's affiliates' acquisition of the underlying shares in the NPRE, SRP, and SRR transactions.

199. GSP and NFG have exercised unauthorized dominion and control over the NMS Shares by, among other things, accepting the return of the underlying MTN Notes from NPRE and SRP without delivering the NMS Shares or their cash equivalent to NMS, and by retaining or disposing of the NMS Shares for GSP's and NFG's own benefit.

200. GSP and NFG have refused, upon demand, to deliver the NMS Shares or their cash equivalent to NMS.

201. GSP's and NFG's exercise of dominion and control over the NMS Shares was intentional and unauthorized, and in derogation of NMS's superior right to that property.

202. As a direct and proximate result of GSP's and NFG's conversion of the NMS Shares, NMS has suffered damages in an amount to be proven at trial, including the value of the NMS Shares wrongfully withheld, retained, or disposed of.

**COUNT XII — SPECIFIC PERFORMANCE**

**(Against GSP and NFG)**

203. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

204. The PSPA and the Amended PSPA are valid and enforceable contracts between NMS and GSP and NFG, supported by adequate consideration, including NMS's investment of $2,700,000,000.00.

205. NMS has performed, or has been excused from performing, all of its material obligations under the PSPA and the Amended PSPA.

206. GSP and NFG have breached and continue to breach their obligations under the PSPA and the Amended PSPA, including by failing to: (a) honor NMS's January 27, 2026 election of the Default Share Purchase; (b) pay all preferred share dividends, commitment-type fees, profit participation dividends, Delinquent Fees, and other amounts due under the transaction documents; (c) deliver shares or cash equivalents as profit participation dividends; (d) provide annual and quarterly financial statements and an annual budget as required by the Amended PSPA; and (e) provide transaction documentation and capital reserve account statements consistent with the terms upon which NMS's investment committee provided its consent to the NPRE, Saturn, Tradex, and Soteria transactions.

207. NFG's assertion, through Beekmeyer and Major, of the purported AML/KYC verification requirement described above does not excuse, delay, or otherwise affect GSP's or NFG's obligations to perform under the PSPA and the Amended PSPA, and is inconsistent with NFG's own representation and warranty under Section 5.3(d) of the Amended PSPA. GSP and NFG therefore have no valid basis to withhold performance.

208. The obligations described above are sufficiently definite and certain to permit judicial enforcement, as the PSPA and Amended PSPA specify the amounts, timing, and mechanics of the Default Share Purchase, the Default Redemption, the profit participation dividends, and the reporting and documentation obligations.

209. NMS has no adequate remedy at law. The subject matter of the PSPA and the Amended PSPA — including Series A Preferred Stock, profit participation rights tied to specific transactions (NPRE, Saturn, Tradex, and Soteria), and governance/reporting rights — involves unique rights and interests for which monetary damages would be speculative, difficult to calculate with certainty, and insufficient to place NMS in the position it bargained for.

210. The balance of equities favors specific performance. GSP and NFG negotiated for and accepted NMS's $2,700,000,000.00 investment in the form of the NMS Notes in exchange for the specific rights and obligations set forth in the PSPA and Amended PSPA, and it would be inequitable to permit GSP and NFG to retain the benefit of that investment while evading their reciprocal obligations.

211. NMS is entitled to an order of specific performance compelling GSP and NFG to: (a) honor NMS's January 27, 2026 election of the Default Share Purchase and effect the Default Redemption of the Series A Preferred Stock at a redemption price equal to the Purchase Price of $2,700,000,000.00, plus all accrued and unpaid dividends and fees, as demanded in NMS's Notice

of Default Redemption; (b) pay all preferred share dividends, commitment-type fees, profit participation dividends, Delinquent Fees, and other amounts due under the transaction documents; (c) deliver shares or cash equivalents as profit participation dividends in accordance with the terms of the PSPA and Amended PSPA; (d) provide annual and quarterly financial statements and an annual budget as required by the Amended PSPA; and (e) provide transaction documentation and capital reserve account statements consistent with the terms upon which NMS's investment committee provided its consent to the NPRE, Saturn, Tradex, and Soteria transactions.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff NMS hereby demands judgment in his favor and against Defendants as follows:

A. On Count I (Breach of Contract), against Defendants GSP and NFG, Plaintiff NMS seeks compensatory damages in an amount to be determined at trial, including unpaid Preferred Share Dividends, Commitment Fees, Profit Participation Dividends, Delinquent Fee penalties, the value of undelivered shares or cash equivalents (including the 10,000 shares of NFG Preferred Stock wrongfully withheld under Section 3.1 of the PSPA), and consequential damages, but believed to exceed $61,446,869.88 for amounts accrued before the Default Redemption election and $2,700,000,000 (plus post-election dividends) as the Default Redemption amount for GSP’s continued breach after the election, subject to the requested accounting.

B. On Count II (Fraud), against Defendants Beekmeyer, Clubb, Payn, and Major, Plaintiff NMS seeks (1) compensatory damages in an amount to be determined at trial, and (2) punitive damages in an amount to be determined at trial.

C. On Count III (Fraudulent Inducement), against Defendants GSP and NFG, Plaintiff NMS

seeks compensatory damages in an amount to be determined at trial.

D. On Count IV (Accounting), against Defendants GSP and NFG, Plaintiff NMS seeks an order compelling a full and complete accounting of all monies, MTN Notes, equity shares, and other property received, held transferred, or disbursed in connection with the NPRE, Saturn, Tradex, Soteria, SRP, and SRR transactions, and of all Preferred Share Dividends, Commitment Fees, Profit Participation Dividends, and Delinquent Fees due and owing to NMS.

E. On Count V (Unjust Enrichment), against Defendants GSP, NFG, NPRE, SRP, and SRR, Plaintiff NMS seeks restitution and/or disgorgement in an amount to be determined at trial, believed to exceed $20,000,000 as to NPRE, plus additional amounts as to SRP and SRR to be determined at trial.

F. On Count VI (Conversion), against Defendants GSP and NFG, Plaintiff NMS seeks compensatory damages in an amount to be determined at trial, representing the value of the NMS Shares wrongfully withheld, retained, or disposed of.

G. On Count VII (Specific Performance), against Defendants GSP and NFG, Plaintiff NMS seeks specific performance by ordering GSP and NFG to specifically perform their obligations under the PSPA and the Amended PSPA, including by:

1. Honoring NMS's January 27, 2026 election of the Default Share Purchase and effecting the Default Redemption of the Series A Preferred Stock at a redemption price equal to the Purchase Price of $2,700,000,000.00, plus all accrued and unpaid dividends and fees;

2. Delivering shares or cash equivalents as profit participation dividends in accordance with the terms of the PSPA and Amended PSPA;

3. Providing annual and quarterly financial statements and an annual budget as required by the Amended PSPA;
4. Providing transaction documentation and capital reserve account statements consistent with the terms upon which NMS's investment committee provided its consent to the NPRE, Saturn, Tradex, and Soteria transactions; and
5. To pay all preferred share dividends, commitment-type fees, profit participation dividends, Delinquent Fees, and other amounts due under the transaction documents, to the extent such relief is not duplicative of relief sought under Plaintiff's breach of contract claims herein.

H. On all counts:

1. Pre-judgment and post-judgment interest as permitted by law;
2. Attorneys' fees and costs to the extent permitted by the Transaction Documents or applicable law; and
3. Such other and further relief as the Court deems just and proper.

DATED: September 4, 2026

FROST LLP

By: ______________________________
Christopher Frost, *(Pro Hac Vice)*
Catherine Liu *(Pro Hac Vice)*

10960 Wilshire Boulevard, Suite 2100
Los Angeles, California 90024
(424) 254-0441

*Attorneys for Plaintiff*